UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. CR-20907-CR-COOKE

UNITED STATES OF AMERICA,

        Plaintiff,

v.

ALCATEL-LUCENT, S.A.,
   f/k/a "Alcatel, S.A.,"

        Defendant.

_____

## PETITION FOR RELIEF PURSUANT TO 18 U.S.C. §3771(d)(3) AND OBJECTION TO PLEA AGREEMENTS AND DEFERRED PROSECUTION AGREEMENT[1]

### INTRODUCTION

Instituto Costarricense de Electricidad ("ICE") objects to the Plea Agreements between Alcatel-Lucent France, S.A., Alcatel-Lucent Trade International, A.G., and Alcatel Centroamerica, S.A. with the Department of Justice (the "Department") and also to the Deferred Prosecution Agreement proposed by the Department (collectively referred to herein as the "Agreements").[2]

ICE also petitions this Court for protection of its rights as a victim of the Alcatel-Lucent Defendants and for appropriate sanctions resulting from the Department's failure to protect those rights for the order compelling the Department to comply with its statutory obligations under the law. ICE objects to the Plea Agreements and the Deferred Prosecution Agreement because:

    1.    They are inconsistent with the provisions of 18 U.S.C. §3771 (et seq.); 18 U.S.C. §3663A; 18 U.S.C. 3664 and Rule 32 of the Federal Rules of Criminal Procedure;

---

[1] ICE has also filed this Petition in *United States v. Alcatel-Lucent, France, S.A. et al.,* Case No. 10-20906-CR-COOKE (S.D. Fla.)

[2] In support of this Petition and Objection, ICE is filing a Memorandum of Law in support of Petition and Objection and has filed an Appendix to this Petition and Objection. Information in the Appendix is referred to herein as Appendix: Exhibit _____, p. _____.

2. They are inconsistent with the interests of justice, with the public's interests, and with public policy; and

3. The Defendants have already violated the terms of the Agreements.

ICE also demands relief pursuant to 18 U.S.C. § 3771 as the Agreements with the Department and the actions of the Department:

l. fail to afford ICE its rights as a victim under 18 U.S.C. §3771(a); and

2. demonstrate the Department's failure to satisfy its statutory obligations under 18 U.S.C. § 3771, 18 U.S.C. § 3663, and 18 U.S.C. §3663A.

The Plea Agreements and Deferred Prosecution Agreement proposed by Alcatel-Lucent and the Department fail to the Department's obligation to enforce federal criminal laws, reward Alcatel-Lucent and its officers and directors, and illegally deprive victims of Alcatel-Lucent's criminal conduct of the rights to which they are entitled to by statute.

ICE alleges the following facts in support of its Petition for Relief and Objections:

## **INSTITUTO COSTARRICENSE DE ELECTRICIDAD**

1. Instituto Costarricense de Electricidad is an autonomous legal entity established by law in Costa Rica in 1949. The company is responsible for providing electrical power and telecommunication services in Costa Rica. The organizational statute and subsequent decrees provide for the absolute autonomy of ICE. The statute creating ICE (Law No. 449)[3] provides in pertinent part:

> "All of the Institute's work progress and any works or prospective work it initiates will be exclusively the result of technical and financial studies performed by the Institute, itself, and no other State or organization will intervene in their determination . . . (Chapter 1, Article 3); and

> "The Institute will be a fully autonomous legal entity for purposes of putting it in the best position to fulfill its objectives. In exchange for this autonomy, the State demands that the Institute and all those who form a part of it respond with absolute responsibility in the complete fulfillment of the objectives set forth in this law." (Chapter 1, Article 4); and

---

[3] See Appendix Exhibit A, *Ley de la Creación del Instituto Costarricense de Electricidad* No. 449 de 8 de abril de 1949, Asamblea Legislativa, Colección de leyes y decretos año 1949, semestre 1, tomo 1, página 257.

"As an autonomous institution, the Institute will carry out its administrative and technical management with absolute independence from the Executive Branch, being guided exclusively by the decisions of its Board of Directors, which will act according to its judgment, adhering to the pertinent laws and regulations and the principles of technique, and will be completely and inevitably responsibilities for its management." (Chapter II, Article 8); and

"The Government will not receive any part of the revenues, as the Institute must not be considered as a source of income for the Treasury... ." (Chapter II, Article 17).

2. In legislative decrees, decisions and resolutions, the independence of ICE as an autonomous legal entity has been confirmed and reconfirmed. No evidence exists to suggest that ICE is not an autonomous entity operating independently of the government.[4]

3. ICE is managed by a seven-member Board of Directors. They are appointed by the Costa Rican Government and serve six-year terms. They cannot be removed, absent malfeasance. These Directors include engineers, accountants and lawyers with distinct areas of expertise. None of the Directors are affiliated with the Costa Rican Government. The Board of Directors appoints and oversees the management and operation of ICE in a manner similar to other large corporations. The Company has over 15,000 employees. All of its management and Directors are subject to a strict ethics code that is enforced by the management and Directors of the Company.[5]

## **ALCATEL-LUCENT S.A.'S CORRUPT BUSINESS PRACTICES**

4. Alcatel-Lucent, S.A. is a large international telecommunications conglomerate. It has over 75,000 employees and operates in over 140 countries. See Appendix Exhibit E, Complaint at ¶9, Securities and Exchange Commission v. Alcatel-Lucent, S.A., No. 10-24620 (S.D. Fla. December 27, 2010). Its shares are traded on the New York Stock Exchange and its executive offices are located in Paris, France and Murray Hill, New Jersey. The company has

---

[4] See Apendix Exhibit B, 1- *Ley de la Creación del Instituto Costarricense de Electricidad* No. 449 de 8 de abril de 1949, Asamblea Legislativa, Colección de leyes y decretos año 1949, semestre 1, tomo 1, página 257; 2- *Ley del Fortalecimiento y Modernización de las Entidades Públicas del Sector Telecomunicaciones*, No. 8660 del 8 agosto de 2008, La Gaceta 156 del 13 de agosto del 2008, alcance 31; 3- *Reglamento al Título II de la Ley de Fortalecimiento y Modernización de las Entidades Públicas del Sector Telecomunicaciones*, Decreto Ejecutivo 35148 del 24 de febrero del 2009, Poder Ejecutivo, La Gaceta 72 del 15 de abril del 2009; 4- *Procuraduría General de la República, dictamen C-332-2009 del 2 de diciembre del 2009*; 5- *Procuraduría General de la República, dictamen C-002-2011 del 11 de enero del 2011*; 6- *Sala Constitucional de la Corte Suprema de Justicia, resolución No. 17600* de las 15:07 horas del 6 de diciembre del 2006; 7- *Constitución Política del 7 de noviembre de 1949*, Asamblea Nacional Constituyente, Colección de leyes y decretos año 1949, semestre 2, tomo 2, página 724.

[5] See Appendix Exhibit C, *Código de Ética del Instituto Costarricense de Electricidad,* Articulo 3 de la sesión 5398, del 23 de abril del 2002.

manufacturing and business operations throughout the United States.  Last year, the Company reported that its annual revenues exceeded 21 billion dollars.  See Appendix Exhibit D, Excerpts of Alcatel-Lucent, 2010 Annual Report (Form 20-F), at p.2 (March 22, 2011).  For decades, Alcatel-Lucent S.A. and its subsidiaries have conducted its international business through an organized system of corruption.  This system was directed by executives in Europe and controlled by management throughout the world.  Exhibit E, ¶3; Information at ¶38, Docket No. 1; See Appendix Exhibit H, Transcript of Christian Sapsizian's Deposition dated  November 30, 2010, at 11:1-5; See Appendix Exhibit I, Transcript of Sentencing of Christian Sapsizian on September 23, 2006 at 12:3-25, 13:1-8.

     5.     By the late 1990's a management structure had been created whereby Alcatel-Lucent was divided into three main zones or divisions:  the Americas, Asia Pacific, and Europe.  See Appendix Exhibit J, Excerpts of Testimony of Maria Jose Unzurrunzaga:[6]  11:12-14; See Appendix Exhibit K, Excerpts of Testimony of Jose Juan Guardiola de la Fuente:  24:7-11; See Appendix Exhibit L, Declaration of Edgar Valverde ¶ 15.  These divisions were divided into smaller sub-regions, such as the Latin America sub-region.  Exhibit J:  11:14-15.  Each sub-region had a hierarchy of officers and other employees that included Presidents, Vice Presidents, and Country Senior Officers ("CSOs").  CSOs operated locally in each country within the sub-region of responsibility and reported to the Vice President of the sub-region, who reported to the President of the sub-region, who in turn reported to the President of the division.  (This management structure did not follow or observe the legal constructs of the various Alcatel subsidiaries had a particular executives' employment with one Alcatel subsidiary did not dictate his management role in this scheme.)  Exhibit E, ¶¶3,15-16; Information, ¶¶ 29-31.

     6.     At the local level, the CSOs were responsible for various things including negotiation of third party "consulting" contracts and winning telecommunications contracts for the Alcatel-Lucent, S.A.'s businesses. Exhibit J: 14:21-15:8; 72:3-6.  In reality, the so-called "consulting" contracts were a ruse to conceal Alcatel's criminal scheme.  Exhibit H: 40:4-10; Exhibit N: 13:9-17; Information, ¶¶ 36-38; Exhibit E, ¶¶ 3, 17.  The Defendants actually used the "consultants," which were also referred to as "lobbyists," to identify officials and decision-makers who could be bribed by Alcatel in exchange for help in winning contracts and to

---

[6] Included in the Appendix as Exhibits J and K are the testimony and translations of testimony of Maria Jose Unzurrunzage and Jose Juan Guardiola.  This testimony was given during 2010 in criminal proceedings in Costa Rica.

4

distribute the bribe money to those decision-makers and officials. Exhibit J: 70:3-11; Exhibit K: 67:1-4; 68:6-13; Exhibit H: 23:17-24; 40:11-14; Exhibit N: 13:9-17; 16:12-23; Information, ¶¶ 29, 36; Exhibit E, ¶¶15, 17; Deferred Prosecution Agreement, pp.A-11–A-13. This system of using purported "lobbyists/consultants" was employed for decades and was common knowledge by agents and employees of Alcatel-Lucent. Exhibit H: 24:10-15; 25:16-25; Exhibit N: 13:4-17

7. Alcatel-Lucent's management enforced rigorous procedures in connection with the "consulting" contracts which were approved throughout the chain of command up through the President of the region and top executives of Alcatel Defendants. Exhibit J: 75:12-22; 172:8-14; Exhibit N: 27:1-25; Exhibit L at ¶15; Exhibit H: 40:24-25; 41:1-4. The entire procedure however was a sham designed to create a false paper trail concealing the Company's organized system of corrupt business practices. Exhibit H: 26:1-28:19; Exhibit E, ¶3; Exhibit N: 10:11-17.

8. Once a CSO determined a "consultant" was needed to obtain a contract, the area President was approached and two forms were completed, a Forecast Sales Expense ("FSE") and a Service Agreement Request ("SAR"). Exhibit H: 26:10-27:1. No copies of the FSE and SAR were permitted to be kept by lower level officials. Exhibit L, ¶16. The FSE identified the commission percentage or "sales expense" to be paid to the consultant. Exhibit H: 27:7-10; Exhibit E, ¶¶ 16-17; Information, ¶32. The FSE was presented to the president of the business division concerned, the president of the legal unit concerned, and the president of Alcatel Standard for approval. Exhibit H: 27:12-17. As President of the Latin American region, Alfredo Redondo[7] approved and executed numerous FSE and SAR forms that were delivered to him by Christian Sapsizian on approximately a monthly basis. Exhibit H: 29:23-31:5, 32:10-32:1, 41:14-18; Exhibit E, ¶30; Information, ¶42.

9. After the President of a region approved the draft agreement, the contract was forwarded to other Alcatel executives. Approval of the senior executive of the Alcatel-Lucent company that manufactured or naturally provided the products or services was obtained. It was then sent to Hugh Barras, President of Alcatel-Lucent's Swiss subsidiary, Defendant Alcatel Standard, Barras approved and signed all contracts on behalf of other subsidiaries (including Defendant Alcatel CIT) that actually engaged the consultants and funneled the money to the consultants using bank accounts in various places, including in Miami, Florida. Exhibit J: 11:2-

---

[7] Alfredo Rodondo is currently the CEO of a publicly held Spanish telecommunications company, Amper, S.A. See Exhibit M, Internet Article "Alfredo Redondo, former President of Alcatel-Lucent, new CEO of Amper" dated July 28, 2010.

5

10, 71:13-14, 172:8-13; Exhibit K: 22:16-22; Exhibit L, ¶ 15; Exhibit N: 17:7-10; 28:1-8. The SAR form contained the name and address of the "consultant", bank account information, and a list of purported services that were to be performed. Exhibit H: 28:7-15.  The services listed on the forms did not accurately reflect what the consultant was going to do.  Exhibit H: 28:16-19; Exhibit E, ¶¶17,19; Deferred Prosecution Agreement, pp. A-11, A-14-A-15; Information, ¶¶ 29, 36; Exhibit N: 13:9-17.  The forms were intentionally drafted to conceal the true purpose of the consulting contracts; they were a mere façade, hiding the true role of the consultants.  Exhibit H: 40:4-14; Exhibit N: 16:18-23; Exhibit E, ¶¶ 3,17.  This process was implemented worldwide, throughout Latin America, including Costa Rica. Exhibit H: 32:4-8;[8] Exhibit E, ¶¶ 15-16; Information, ¶38.

### The Bribery of Costa Rican Government Officials and Senior Officials of ICE

10.     In the case of Costa Rica, the country's CSO, Valverde, identified three "consultants", including Intelmar S.A., HF Desarrollos Integrales, and Servicios Notariales, Q.C.[9] Contracts for these consultants were approved by the President of Latin America.  Once approved by the upper echelons of the company, Alcatel-Lucent funneled monies as "commission payments" through its subsidiaries (including Defendant Alcatel CIT) to the consulting firms, which in turn used the money to induce a total of five decision-makers affiliated with ICE to award Alcatel-Lucent valuable telecommunications contracts.  Exhibit J: 10:15-21; Exhibit N: 11:1-5.  Through this criminal scheme, Alcatel-Lucent and its subsidiaries'

---

[8] Between 2000 and 2003, Costa Rica belonged to the Latin America sub-region of the Americas Division of Alcatel-Lucent.  Exhibit J: 14:6-7; 96:18-19.  The Americas Division was headquartered in Texas and overseen by Michael Quigley. Exhibit J: 42:7-8; Exhibit K: 34:18; Exhibit L, ¶ 10; Exhibit H: 17:9-10.  The President of the Latin America sub-region was a man named Alfredo Redondo ("Redondo") who oversaw Alcatel-Lucent's operations in all countries in Latin America, including Costa Rica, from Miami, Florida. Exhibit J: 40:16-21; 90:9-13; Exhibit K: 6:10-11; 8:5-6; 32:22-33:8; 41:17-42:11; 86:21-22; Exhibit H: 15:8-22; 17:11-14; The Vice President of the Latin America sub-region was Marcel Mafille from 2000 through approximately 2003, and then Miguel Robirosa. Exhibit J: 14:10-12; 86:12-15; Exhibit K: 5:18-20; 43:10-14; See Appendix Composite Exhibit R, Excerpt of Trascript of Edgar Valverde Acosta's Deposition dated October 14, 2004 and November 30, 2004: 7:1-3; Exhibit H: 17:19-23; 18:7-19; Exhibit L, ¶ 12; The Associate Vice President of the Latin America sub-region was Christian Sapsizian and the CSO of Costa Rica was Edgar Valverde Acosta.  Exhibit J: 14:10-21; 46:1-3; 72:3-5; 96:20-97:2; Exhibit K: 5:3-6; 30:13-15; See  Appendix Exhibit N, Plea Agreement of Sapsizian, Attachment A, Factual Basis Underlying the Plea ¶¶ 8, 9; Exhibit L, ¶ 12.  Valverde reported, in part, to Sapsizian, who reported to Mafille and later to Robirosa and jointly to Redondo, who in turn reported to Quigley.  Exhibit J: 14:4-18; 39:18-40:10; 197:1-11; Exhibit K: 5:15-20; 21:16-19; 30:9-15; 32:6-17; 34:14-18; Exhibit L, ¶ 13; Exhibit H: 16:15-21; 18:1-21; 40:24-25; 41:1-5.

[9] The "consultants" provided no legitimate business support or advice and frequently had no telecommunications expertise whatsoever.  For example, one of the "consultants" used in Costa Rica was Servicios Notariales, Q.C., which was an entity owned by Quiros Carmona, Valverde's brother-in-law, that had nothing to do with telecommunications. Exhibit J: 73:21-74:3; Exhibit K: 6:18-21; 57:22-58:4; Exhibit E, ¶23; Exhibit H, pp. 23-24].

procured from ICE contracts valued at over $400 million for wireless telecommunications equipment and maintenance services. Alcatel Defendants paid over $18 million to consultants who paid bribes over the course of several years. Exhibit J: 80:18-22; <u>See</u> Appendix Exhibit N, Plea Agreement and Factual Basis Underlying Plea Agreement of Christian Sapsizian, ¶¶ 12, 16; Exhibit H: 25:3-21. Bribes were paid to three Directors and two senior officials of the ICE. Exhibit J: 28:5-18; 119:5-7; Exhibit K: 10:15-17; 11:4-6; Exhibit N, Attachment ¶ 17; Exhibit N: 10:11-17. These ICE employees and Directors utilized their positions with ICE to help obtain approval of the Alcatel-Lucent contracts.

11. Although Alcatel Lucent had engaged in its corrupt practices for decades, its activities in Colsta Rica were first revealed in the Costa Rican press in 2004. Exhibit N: 22:25; 23:1-13; <u>See</u> Appendix Exhibit U, Transcript of Status Conference before Honorable Judge Marcia G. Cooke on March 9, 2011: 6:18-25. At that time, Alcatel-Lucent executive Edgar Valverde Acosta, admitted bribing ICE Directors and employees in Costa Rica. Exhibit H: 24:10-15; Exhibit N: 31:10-12. The admission led to a media frenzy and investigations in the United States and France, among other places. Exhibit J: 255:2-8; <u>See</u> Appendix Exhibit O, Excerpts of Alcatel-Lucent 2009 Annual Report on Form 20-F/A, ¶ 6.10; <u>See</u> Appendix Exhibit P, Excerpts of Alcatel-Lucent 2009 Consolidated Financial Statements, pp. 113-116.

12. When ICE learned of this corruption, the three disloyal and corrupt Directors and two disloyal and corrupt employees were promptly terminated. All were subjected to prosecution by the Costa Rican Government. ICE supported and participated in the prosecution.[10] <u>See</u> Appendix Exhibit Q, Certified documents detailing actions taken against ICE employees taking bribes. The corrupt activities of Alcatel Lucent combined with the dishonesty of these company officials and their disloyalty to ICE has caused the company massive losses. These corrupt officials were a disgrace to ICE. They exploited their positions for personal gain, not for the benefit of ICE, in fact causing ICE catastrophic harm.[11]

13. After Valverde admitted to the criminal scheme and it became public knowledge, Alcatel-Lucent and its subsidiaries took active measures to conceal the corporations' true

---

[10] One of the individuals became a cooperating witness, another has already pled guilty and been sentenced. Costa Rican law allows victims of crimes to participate in proceedings and receive "moral damages." The Costa Rican proceedings are ongoing. Initial rulings are expected at any time.
[11] These damages include, without limitation, money furnished to "consultants" for bribes, profits of Alcatel-Lucent, overpayment of contracts, defective equipment and services, lost business, services and profits, interest paid remediation expenses and lost opportunity costs.

involvement. Alcatel-Lucent initially promised to financially support Valverde if he gave false testimony concerning the company's role in the criminal scheme. Exhibit R, at 2:1-5:21; 14:20-24. Likewise, other employees were pressured by Alcatel-Lucent and even threatened with termination if they discussed the company's involvement in the scheme. See Appendix Exhibit I, Christian Sapsizian Sentencing Transcript Dated September 23, 2006, 24:18-25:2. The company purportedly conducted an "internal investigation" overseen by several Alcatel-Lucent executives: Alfredo Redondo, Jose Guardiola, Maria Jose Unzurrunzaga, Juan Porro, Eduardo Rojas and Miguel Robirosa. Exhibit J: 16:2-17, 17:10-16. The individuals in charge of investigating the events in Costa Rica were the same ones who were responsible for managing Alcatel-Lucent, S.A.'s Latin America operations. Essentially, they were the managers of the corrupt business they were supposed to be investigating. The senior member of the investigating team was Alfredo Redondo the President of Alcatel-Latin America. According to the charges filed by the Department and the SEC where Redondo signed the "consulting agreements" he stated that his actions could send him to jail. Information, ¶42; Exhibit E, ¶30.

14.   As a result of the "internal investigation," Alcatel CIT initiated a public criminal action against Sapsizian, Valverde, and others. Exhibit J: 15:2-17. This action by Defendant Alcatel CIT was brought with the obvious purpose of making those individuals who operated at the direction of Alcatel-Lucent and its subsidiaries scapegoats and diverting responsibility for the criminal scheme away from Alcatel-Lucent S.A. Alcatel-Lucent charged that these individuals had acted alone and indeed had defrauded Alcatel-Lucent. Alcatel-Lucent even had the audacity to claim that it had been defrauded by its own corrupt conduct. That action was commenced on January 31, 2007 by Alejandro Batalla Bonilla, Esq., Alcatel CIT's attorney. See Appendix Exhibit S, Criminal Complaint under the First Judicial Circuit against Edgar Valverde and others, Case No. 04-7810-647 PE, January 31, 2007, San Jose Costa Rica. Batalla's law firm participated in the submission of plea agreements to this Court.

15.   The Alcatel Defendants made the following allegations, among others, in the criminal proceeding:

> Lobbying activities can lead to certain doubts, and when they are not performed in a transparent manner, they can degenerate into activities of influence trafficking or some form of bribery, to which Alcatel is overtly opposed. Alcatel has adopted business policies that do not permit bribery, either direct or indirect, the payment of kickbacks or any other payments or activities that could be considered as corrupt business practices.

>    The defendant, Valverde Acosta, in complicity with the other defendant, Sapsizian Auvignon, formulated a plan to defraud the representatives of Alcatel, leading them to believe in the necessity of contracting companies with experience in consulting and promotion of interests, with knowledge of, and positioning in, the Costa Rican market, in order to win the contracts being offered by ICE. Based on that necessity, the defendants, Valverde Acosta and Sapsizian Auvignon, in the exercise of the duties of their <u>respective</u> positions, but betraying the trust placed in <u>them</u>, recommended the company, Servicios Notariales QC, S.A.
>
>    Representatives of Alcatel, Alcatel CIT and Alcatel Standard, S.A. were defrauded with regard to the necessity for contracting the firm, Servicios Notariales QC, S.A., for such important projects, as well as with regard to its capability, suitability and experience and, lastly, in terms of the execution of the agreements contained in the contracts signed for those purposes. Various members of the board of Alcatel were defrauded, among them Alfredo Redondo and Jean Laiheugue, as well as those of Alcatel Standard, S.A., whose representative was and still is Mr. Hugh Barras. The latter company is the subsidiary of Alcatel Corporation in charge of approving and contracting consultants for various projects all over the world, but not for their payment, which is then made by each operational company.
>
>    As a consequence of the reports in the media and of their own internal investigation, Alcatel became aware that the company, Servicios Notariales QC, S.A. was not a company dedicated to multidisciplinary consultancy for high-tech service companies, nor was it dedicated to the administration and promotion of the interests of transnational companies. The company also learned of the family ties between Luis Adrián Quirós Carmona, Carmen Lidia Rojas Carranza and the Director of Alcatel of Costa Rica, S.A., the defendant, Edgar Valverde Acosta, which was carefully hidden during the hiring and execution process, because if this circumstance had been previously known, it would have impeded the hiring of Servicios Notariales QC as consultants.

<u>See</u> Appendix Exhibit S, Criminal Complaint under the First Judicial Circuit against Edgar Valverde and others, Case No. 04-7810-647 PE, January 31, 2007, San Jose Costa Rica., ¶¶6,15,18,25.

16.     Alcatel-Lucent's deception and concealment of this scheme did not cease with the contrived criminal allegations filed in Costa Rica. The company also made repeated false filings in their periodic and annual reports filed with the SEC[12]. These filings failed to disclose the "culture" of corruption that existed throughout the company and only reported isolated incidents

---

[12] <u>See</u> Appendix Composite Exhibit T, Excerpts Alcatel Lucent SEC Annual Report, Form 20-F/A for the years 2005 through 2007 Attachments 1 through 3.

as they became public.[13] Indeed, the Deferred Prosecution Agreement notes that Alcatel-Lucent was initially uncooperative with the Department and conducted another sham investigation that has been described by the Department as "less than honest". Deferred Prosecution Agreement, ¶4. This conduct was consistent with years of denials and obfuscation. Id.

17. It was not until late 2006 when Christian Sapsizian was arrested and began providing assistance to the government that Alcatel-Lucent was forced to cooperate with the Department and the SEC. This individual's evidence allowed the government "to force the corporation [Alcatel-Lucent] to conduct a more thorough internal investigation." Exhibit N: 13:20-22. Indeed it was only when Mr. Sapsizian led the government to where the bones were buried that Alcatel-Lucent even professed to take responsibility for its action – and it did so only when a cooperating witness made the companies guilt undeniable.[14]

18. Alcatel-Lucent had created a system to falsely document the legitimacy of its agreements with foreign "consultants" as a medium to conceal its corrupt conduct. This system was created at the highest levels of the company and might have been successful had it not been for Mr. Sapsizian. As stated by the Department:

> "…because it was papered that way, Your Honor, unless you have a corporate inside[r] or Mr. Sapsizian can direct you to what was really happening, it is heard [sic] to make that case and that is what Mr. Sapsizian did for us, and is doing for us in an ongoing fashion, and it also assisting foreign law enforcement authorities to do more."

Exhibit I: 17:17-22.

19. Mr. Sapsizian pled guilty to conspiracy and aiding and abetting. In spite of his cooperation, the Department's glowing statements as to his cooperation, and Judge Seitz's observation that having sentenced close to 15,000 people, Sapsizian's level of cooperation was greater than she had seen in any other case, he was sentenced to 30 months in prison and forced to pay over $260,000 to the government.[15]

**Criminal Prosecution of Alcatel-Lucent**

---

[13] Exhibit H: 25:23-25.
[14] The Department has been very clear that Alcatel-Lucent's purported contrition and cooperation was only due to Mr. Sapsizian cooperating with the government. Exhibit N: 14:9-20; See Appendix Exhibit U Transcript of Status Conference before the Honorable Marcia G. Cooke United States District Judge dated March 9, 2010: 7:7-9; Deferred Prosecution Agreement, ¶4.
[15] At Sapsizian's sentencing, after the presentation by the Department, the SEC and Mr. Sapsizian Judge Seitz stated: "To the extent that I can on behalf of the citizens of this country, you are forgiven." Exhibit I, 32:23-24.

20. After receiving the assistance of Christian Sapsizian, the government proceeded with its investigation of Alcatel-Lucent. Almost three years later, in February of 2010, Alcatel-Lucent announced that it had reached an agreed settlement with the government relating to its world-wide criminal activities. This agreement as announced would provide payment of $92,000,000 in fines as a result of a Deferred Prosecution Agreement, and the payment of $45,372,000 in disgorgement in a related SEC civil enforcement proceeding. Up to this point in time, no agent of the Department or the SEC had contacted ICE in connection with the criminal activities of Alcatel-Lucent. Neither the Department nor the SEC sought to gather or verify any facts from ICE nor make inquiry with respect to the damages that the company had suffered. Within months of the public announcements by Alcatel-Lucent, ICE, through its lawyers, contacted both the SEC and the Department to make known its position as a victim of Alcatel-Lucent's crimes and to participate in the procedures that are required by the Department and the SEC designed to protect victims of criminal conduct and for the distribution of ill-gotten gains.[16]

21. The SEC denied ICE's requests for a "Fair Fund" without explanation and the Department has indicated it did not consider ICE a victim, apparently taking a position that companies where employees are bribed are culpable or that ICE is not autonomous and entities that are related to governments cannot be victims.[17] Correspondence to the Department requesting an explanation of its position and legal authority therefore has gone unanswered.[18] As mentioned above, at no time has the Department contacted ICE regarding its rights as a victim or attempted to gather any information from ICE regarding the vast damages and harm it has suffered. Neither the Department nor the SEC has asked ICE for any evidence in this case, apparently relying solely on Mr. Sapsizian and Alcatel-Lucent (criminals they have charged) for information upon which to base their cases.

---

[16] The SEC has the ability to order the creation of a "Fair Fund" for the benefit of investors who were harmed by the violation. See Rules of Practice and Rules on Fair Fund and Disgorgement Plans, January 2006, p.103, http://www.sec.gov/about/rulesprac2006.pdf

[17] The Department has referred to a "policy" for not recognizing foreign governments as victims. No written policy of the Department exists and the only policy that has been found was located in public statements of former Department officials Mark Mendelsohn and William Jacobson, who in essence indicated that lesser developed countries are inherently corrupt and thus they cannot be treated as victims. See Appendix Exhibit V, "U.K. Bribery Reparations a Risky Business", Christopher M. Matthews, July 15, 2010. http://www.mainjustice.com/justanticorruption/2010/07/15/u-k-bribery-reparations-a-risky-business/

[18] See Appendix Composite Exhibit W, Correspondence with SEC and DOJ with Attachments 1 through 6.

**Alcatel-Lucent's Agreement With The Government**

On December 27, 2010, the Department and the SEC filed agreements with Alcatel-Lucent – some ten months after the deal had been publicly announced by Alcatel-Lucent and some seven years after the Department claims it began its investigation. The Department entered into a Deferred Prosecution Agreement with Alcatel-Lucent that provides for the following:

a.  The filing of an Information against Alcatel-Lucent S.A. charging only violations of the Foreign Corrupt Practices Act 15 USC §§78c(b)(2)(A); 78c(b)(2)(B); 78c(b)(5); and 78ff(a). These charges relate solely to allegations that Alcatel-Lucent did not keep accurate books and records and did not have adequate internal controls;

b.  No criminal conviction of Alcatel-Lucent S.A;

c.  No compliance with the current Crime Victims' Rights Act;

d.  A fine to Alcatel-Lucent of $92,000,000 that, because the Department allows Alcatel Lucent payment terms over three years, reduces the present value of the settlement by several million dollars less that the stated amount;

e.  Secrecy of Alcatel-Lucent evidence and documents by providing for offshore monitoring of Alcatel Lucents' conduct;

f.  Immunity from prosecution for Alcatel-Lucent, S.A.;

g.  A prohibition against denial by Alcatel-Lucent of the facts contained in the Information filed by the Department;

The Department also entered into Plea Agreements with three Alcatel-Lucent S.A. subsidiaries by which they will plead guilty to violations of 18 U.S.C. §371.[19] These plea agreements contain the following significant terms:

a.  Admissions by all these subsidiaries that they engaged in broad varying criminal conduct;

b.  Pleas admitting guilt to charges of conspiracy under 18 U.S.C. §371 to commit bribery and various specified acts prohibited by the Foreign Corrupt Practices Act;

---

[19] The allegations of the Information clearly make out criminal violations in addition to those actually charged. The allegation obviously would support charges of mail fraud and wire fraud, as well as massive money laundering and racketeering. If one reads the public filings made by Alcatel-Lucent, S.A. for 2001 forward, it is also apparent that securities fraud and filing violations also occurred, as the company's filings are clearly misleading and incorrect insofar as its corrupt business practices are concerned.

    c.    An agreement from the government to support the subsidiaries by touting the "cooperation" of Alcatel-Lucent with the government should the companies be prosecuted elsewhere;

    d.    Limiting the formal penalty against the subsidiaries to $500,000 per subsidiary, rather than the required penalty of twice the amount of gains or gross pecuniary loss, whichever is greater.  In limiting this fine the Department and Alcatel falsely represent to the court that making such determinations would "unduly complicate or prolong the sentencing process".

    e.    A waiver of presentence procedures with the intended result of avoiding a legally required presentence investigation and report, and a legally required determination of restitution thereby improperly reducing the required penalty to these entities by hundreds of millions of dollars;

    f.    An agreement to attempt to persuade the court to abandon all presentence procedures and immediately enter sentence at the time of the plea thereby assuring there will be no presentence procedures or restitution;

Alcatel Centroamerica Plea Agreement, Docket No. 12.

The agreement between Alcatel Lucent and the SEC provides for a civil injunction enjoining Alcatel Lucent from violating the Foreign Corrupt Practices Act in the future and requiring payment of $45,372,000.00 in disgorgement of "illegal" profits from four victims of Alcatel Lucent's corruption.  This agreement with Alcatel Lucent does not require the admission or acknowledgement of any wrongdoing for the actual offense conduct.  It provides no sanctions against any officer, executive director, or employee of Alcatel Lucent and provides that the illegal proceeds obtained from *victims* be distributed to the federal government.  The SEC did not establish a "Fair Fund" for victims without any consideration for the victims of the violations that were charged.  <u>See</u> Appendix Exhibit F, SEC Final Judgment as to Defendant Alcatel Lucent, S.A. and Appendix Exhibit G, Consent of Defendant Alcatel Lucent, S.A.

In sum, the deal between Alcatel Lucent and the government allows the Company to conceal the information relating to its criminal conduct; resolve all criminal exposure through the payment of a fine below the legal required minimum; provides immunity for the companies from prosecution beyond paying these insufficient fines; avoid required presentence procedures; avoid a criminal conviction for Alcatel Lucent S.A. and thereby appropriate administrative restrictions applicable to convicted criminals; and further avoid legally required restitution.

### The Department's Failure to Carry Out Its Responsibilities

Under Section 18 U.S.C. § 3771, 18 U.S.C. § 3663, 18 U.S.C. § 3663A, 18 U.S.C. § 3664, and Rule 32(c) of the Federal Rules of Civil Procedure, the Department, in connection with a plea and conviction for a Title 18 crime, is required to carry out a broad array of responsibilities designed to provide information to the Court as part of sentencing procedures and is obligated to affirmatively act to protect the victims of crimes.  The foregoing statutes, among others, require the Department to, at a minimum:

1. Consult with all identified victims;

2. Provide all victims with timely accurate notice of all court proceedings;

3. Assure and provide information to all victims entitled to restitution;

4. Assure that all victims are treated with fairness and dignity;

5. Assure the protection of rights of all victims;

6. Ensure that Officers and employees of the Department and other departments and agencies of the United States use their best efforts to see that crime victims are notified and accorded victims' rights.

18 U.S.C. § 3771, (2004).

None of these obligations were met or even attempted by the Department in connection with the criminal investigation and prosecution relating to Alcatel Lucent.  At the time that Christian Sapsizian was sentenced, no notification of any kind was provided to any victim of that crime.  Attempts by ICE to be heard with respect to matters relating to prosecution and sentencing of Mr. Sapsizian were rejected.  With respect to participation in this prosecution of Alcatel Lucent and its subsidiaries, ICE's appearance only occurred because ICE affirmatively sought to be notified with respect to the proceedings before this Court.  Absent that effort, the Department of Justice presumably would have concluded this proceeding without any notification to ICE.  Moreover, prior to the presentation of this matter to the Court, the Department has made no attempt to gain any information with respect to the damages or harm that has occurred to victims, made no attempt to solicit the views of victims with respect to this prosecution, made no attempt to assure guaranteed restitution for the victims of Alcatel Lucent's

crimes, or made any attempt to gather information necessary to appropriately compute mandatory fines in connection with this prosecution.[20]

### Alcatel-Lucent's Violation of its Agreement with the Department

Alcatel-Lucent has already violated its agreements with the Department that have been submitted to this Court. As part of the Deferred Prosecution Agreement between Alcatel-Lucent, S.A. and the government, Alcatel-Lucent agreed that it would not, through any of its employees or agents, make any public statement in any litigation or otherwise contradicting the acceptance of responsibility by Alcatel-Lucent for the facts set forth in the allegations by the Department against Alcatel-Lucent. These agreements were submitted to the Court on December 27, 2010 and yet on February 17, 2011, Alejandro Batalla, an attorney representing Alcatel-Lucent entities, appeared in Court in Costa Rica and flatly denied any criminal responsibility by Alcatel-Lucent companies in, claiming instead that all responsibility for the bribery and corruption that occurred in Costa Rica was the responsibility of Christian Sapsizian and Edgar Valverde. See Appendix Exhibit X, Excerpts of Alejandro Batalla's Closing Statements dated February 17, 2011. Based upon a review of the allegations of the Plea Agreements, the Information, and the facts accepted in the Deferred Prosecution Agreement, the statements by Attorney Batalla not only breach the agreements that are before the Court but also constitute a continuation of Alcatel-Lucent's attempted denial of its criminal culpability and avoid some of the responsibility for its criminal acts. Thus it is clear that even before the Plea Agreement can be accepted, Alcatel-Lucent, S.A., through its attorneys, is already violating the promises it made in order to garner the benefit of its agreement with the Department.

### Effect of Alcatel Lucent's Agreement with the Department and the SEC

The Plea Agreements and the Deferred Prosecution Agreement between Alcatel Lucent S.A. and its subsidiaries and the Department as filed with this Court allows Alcatel Lucent to resolve this criminal prosecution with sanctions that are below those minimally required by federal law and sentencing guidelines. These sanctions include Alcatel Lucent S.A.'s admission of guilt only with respect to not having proper procedures for maintaining accurate books and records rather than the willful corruption in which it engaged for decades. The Department has failed to prosecute responsible executives and employees of Alcatel Lucent S.A. and its

---

[20] If indeed it is the Department's position that ICE was a "participant" in Alcatel-Lucent's criminal scheme, it is nothing short of astounding that it has made a decision with a potential impact of hundreds of millions of dollars on the company, without even the courtesy of a phone call.

subsidiaries (other than one low-level employee who was almost solely responsible for the Department being able to bring this case), seeks to allow Alcatel Lucent S.A. to avoid restitution as required by law, and, to the extent monetary penalties were imposed applied in this case, places the burden of those penalties on the public shareholders of Alcatel Lucent S.A.

WHEREFORE, ICE respectfully requests this Court grant the following relief:

1. Reject the Plea Agreements and Deferred Prosecution Agreement as currently presented to the Court;
2. Enter an Order declaring that ICE is a victim of the criminal conduct of Alcatel Lucent S.A. and its subsidiaries as alleged by the Department and directing that ICE is entitled to all rights of a victim, including restitution;
3. Enter an Order directing full pre-sentence procedures required by federal law be applied in this case, including the preparation of a pre-sentence report;
4. Enter an Order allowing ICE to present evidence of damages suffered directly to the Probation Officer for the purpose of determining appropriate restitution amounts and that the presentation of said evidence be without the intervention of the Department;
5. Enter an Order directing the Department to scrupulously comply with the provisions of 18 U.S.C. § 3771 and its specific obligations to ensure that ICE is entitled to all rights of a victim of the crimes alleged.

The foregoing relief is requested to enforce the provisions of Title 18 U.S.C. § 3771 to ensure and protect the rights of victims like ICE.[21]

Respectfully Submitted,

---

[21] Pursuant to 18 U.S.C. §3771(d0029(3) this Petition for Relief is required to be heard by the Court forthwith.

s/ *George L. Guerra*
George L. Guerra
Florida Bar No. 0005762
gguerra@wiandlaw.com
Gianluca Morello, Esq.
Florida Bar No. 034997
gmorello@wiandlaw.com
Dominique H. Pearlman, Esq.
Florida Bar No. 0044135
dpearlman@wiandlaw.com
Jordan D. Maglich, Esq.
Florida Bar No. 0086106
jmaglich@wiandlaw.com
WIAND GUERRA KING P.L.
3000 Bayport Drive, Suite 600
Tampa, FL  33607
Tel. 813.347.5100
Fax 813.347.5155

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on the 2nd day of May, 2011, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

*/s/ George L. Guerra*
George L. Guerra (FBN: 0005762)

17